Syllabus.

## Staunton.

## MAX HELLER AND ELI HELLER v. COMMONWEALTH.

September 20, 1923.

1. ARSON—*Fire Set to Obtain Insurance—Evidence Sufficient to Support Verdict of Guilty.*—In the instant case accused, uncle and nephew, were charged with burning a storehouse with intent to collect the insurance on a stock of goods contained therein. While the evidence was largely circumstantial, it was sufficient to warrant the jury in finding that the nephew set fire to the property and that the uncle procured, aided, and abetted in the act. Both uncle and nephew hauled goods away from the store in the day and at night shortly before the fire, evidently preparing to burn the property. Much space in the store was taken up with empty boxes, and there was other evidence tending to show that the stock of goods was over-insured. Circumstantial evidence sufficiently showed that the nephew, who was only a clerk for his uncle, and had no interest in the property, set fire to the building, and upon the evidence, the conclusion was irresistible that he committed the deed at the suggestion of and for the benefit of his uncle, with the intent on the part of both of them to collect the full amount of the insurance and thereby injure the insurer.

   *Held:* That the evidence was sufficient to support a verdict of guilty against both of the accused.

2. ARSON—*Insurance—Insurance on Stock of Goods but not on Building.*—In a prosecution for burning a building with intent to collect insurance on a stock of merchandise contained therein, the question of insurance on the building was immaterial, since, if the defendants burned the stock of goods with intent to injure the insurer, they were guilty, whether the building was insured or not.

3. REASONABLE DOUBT—*Moral Certainty—Instructions.*—"Beyond a reasonable doubt" and "to a moral certainty" are synonymous terms, and either might be properly used alone in an instruction. But, when both expressions are used in the same instruction, the jury, who are not expected to know the technical meaning of such phrases, would naturally believe that something more than proof beyond a reasonable doubt was necessary before they could convict.

4. INSTRUCTIONS—*Repetition.*—Where other instructions already given fully and sufficiently cover the principles of law laid down in a requested instruction, the latter instruction is properly refused.

Error to a judgment of the Circuit Court of Rocking-
ham county.

*Affirmed.*

The opinion states the case.

*Charles A. Hammer* and *Aubrey G. Weaver*, for the
plaintiffs in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr.,
Assistant Attorney-General,* and *Leon M. Bazile, Second
Assistant Attorney-General,* for the Commonwealth.

WEST, J., delivered the opinion of the court.

This is a writ of error to a judgment sentencing Max
Heller and Eli Heller to serve a term of two years each
in the penitentiary, for willfully burning a storehouse
and stock of merchandise and fixtures, with intent to in-
jure the insurer.

The indictment charges that Eli Heller burned the
property and that Max Heller hired, procured, aided
and abetted him to commit the felony.

In March, 1919, Max Heller began a mercantile busi-
ness (dry goods, shoes and clothing) in a brick building
in Waynesboro, Virginia, where he remained until Jan-
uary, 1922, when his lease expired.   The lease was re-
newed for four years, and, his landlord having agreed to
make certain repairs, Heller moved his stock of goods to
Harrisonburg, Virginia, and opened for business.   There
was adequate fire protection in both Waynesboro and
Harrisonburg.

March 1, 1922, he rented a frame building under a
monthly lease, in Elkton, Virginia, where there was no
fire protection, and moved his goods and fixtures from
Harrisonburg to Elkton.

About eight o'clock, on the night of April 11, 1922, this building was discovered on fire. Citizens of the town who forced the front door open found the fire in the closet in the northwest end of the smoke filled room. Efforts to save the building appearing useless, they began to remove the merchandise and saved two-thirds of the stock.

Max Heller, owner of the store, had gone to Waynesboro the day before, and did not return until eleven o'clock the night of the fire. The only clerk in the store, except a Miss Frasier, was Eli Heller, the other defendant, a young man twenty years old and a nephew of Max Heller.

On the day of the fire, Eli Heller went to supper just before six o'clock and returned about six-thirty, when Miss Frasier left for the night. At that time the store was in its usual condition, and when Eli Heller closed, about ten minutes before the fire was discovered, he left no lights burning, no fire in the stove and locked the front door and securely fastened the back door. The only window, except the stationary window in front and a back window with bars across it, was in the closet, and was also protected with bars.

Twenty-five or thirty minutes before the fire Eli Heller was alone in the store, walking towards the back of the building with a lamp in his hands. After closing, he went to the hotel, where he was seated on the porch when he first heard that there was a fire in town.

Strange, to say the least, he expressed the belief that the fire was in their store, and left the hotel at once. Later, however, other guests of the hotel met him in a drug store some distance from the scene of the fire, inquiring for the Western Union telegraph office, and he was not seen at the fire until the building was half burned and much of the merchandise saved. His ap-

parent indifference as to the goods saved and remark that "this stuff is useless to me; I do not want it" attracted attention, and were in striking harmony with his noticeable nervousness during the early afternoon.

Max Heller did not reach Elkton until 10:44 the night of the fire. Shortly afterwards he and Eli Heller approached the policemen who were guarding the goods saved, and in reply to a question concerning the safety of his merchandise, replied: "To hell with the goods, it is no good to me, let them go to it." Later he remarked to another merchant, "It is a good thing you got your automobile out," to which the party replied, "Yes, sir; it would have been an awful good thing if you fellows hadn't set this building afire and burnt us all up and put us in this kind of condition, too. The best thing you can do is to say little and be getting down the road." Max Heller made no reply, and neither of them took into his possession or undertook in any way to care for the merchandise. Both left town the next morning and did not return until the insurance adjuster came.

The fire originated in the closet which could be entered only from the inside of the store, and when the fire was discovered the closet door was closed. Mrs. Flory, who lived about 200 feet east of the Heller building, was attracted by the odor of burning coal oil and burning pine coming from that direction, and shortly afterwards saw a light on the east side of the building. The closet was sealed with thin boards and was cleaned out when Heller took charge of the building, but after the fire, immediately under the place where the closet was located, there were found in the debris a five gallon oil can and a one gallon oil can.

Max Heller carried no insurance on his stock while in Harrisonburg, but insured it for $6,000.00 in the store in Elkton on March 25, 1922. Afterwards the policies

were endorsed transferring $400.00 of the insurance to store fixtures. At the time this insurance was taken he valued his stock at $8,000.00, notwithstanding his offer made shortly before to sell it for $4,000.00, and on January 13, 1922, he made oath to the commissioner of the revenue, when applying for a merchant's license, that the value of goods on hand and probable purchases to May, 1922, amounted to only $2,855.00. Furthermore, the evidence shows that practically all the stock was brought from Harrisonburg to Elkton in one truck load, and that several witnesses regarded his stock as shoddy, and valued it at $1,800.00 to $3,000.00. When the merchandise was removed from the store during the fire, many boxes were found empty, and out of forty or fifty boxes which were thrown out of the window there was not in them over one dozen pairs of shoes. Much space in the store was taken up with empty boxes, including many boxes on shelf space. A short time before the fire both the defendants were seen at different times, in the early morning and at night time, removing large packages from the store in an automobile.

Max Heller testified that the day before the fire he left Elkton and went to Waynesboro, and that on the night of the fire he came to Grottoes, Virginia, *unexpectedly*, and that Eli had no knowledge he was at Grottoes. Eli Heller testified that when Max left Elkton he said he was going to Waynesboro, and when the fire occurred he thought his uncle was at Waynesboro, and had no idea he was at Grottoes, and that he rushed to the telegraph office to wire him. But the telegraph operator testified that Eli Heller told him he wanted to send a telegram to his uncle, Max Heller, at Grottoes.

Viewing the evidence from the standpoint of the Commonwealth, we find the foregoing among the material facts in the case. In some respects, these facts were

controverted by the evidence introduced on behalf of
the defendants, but it was for the jury to say to which
witnesses they would give credence.

The defendants rely on three assignments of error.

The first assignment is the refusal of the court to set
aside the verdict as contrary to the evidence.

[1] While the evidence is largely circumstantial, it is
sufficient to warrant the jury in finding that Eli Heller
set fire to the property with the intent charged in the
indictment, and that Max Heller procured, aided and
abetted in the act.    Both Eli and Max Heller hauled
goods from the store, in the day and in the night time,
shortly before the fire (each knew about the empty
boxes in the shelf space and elsewhere), evidently pre-
paring to burn the property and make a false claim
against the insurance companies.    Eli was only a clerk
for his uncle and had no interest in the property which
he set on fire.    Upon the evidence, the conclusion is ir-
resistible that he committed the deed at the suggestion
of and for the benefit of his uncle, and with the intent on
the part of both of them to collect the full amount of the
insurance and thereby injure the insurer.    There is am-
ple direct and circumstantial evidence showing a com-
mon plan carried out by one of the defendants and yet
the will and deed of the other.    *Rasnake & Bumgard-
ner* v. *Commonwealth*, 135 Va. 677, 115 S. E. 543.

We find nothing in the case of *Jones* v. *Common-
wealth*, 103 Va. 1012, 49 S. E. 663, relied on by the de-
fendants, to sustain their contention that the verdict is
without evidence to support it.    Unlike the instant
case, in that case there was no direct testimony tending
to prove the *corpus delicti;* and admitting the criminal
origin of the fire, there was no proof that the defendant
was the criminal agent, except that he had the oppor-
tunity to commit the crime and cherished ill feelings,

and had made threats, against the owner of the build-
ings which were burned, and these *alone* were held in-
sufficient to warrant a conviction.

The second assignment of error is the action of the
court in giving the following instruction:

"The court instructs the jury that if they believe
from the evidence beyond a reasonable doubt that Eli
Heller set fire to the building occupied by Max Heller as
a store, as charged in the indictment, and that Max
Heller, though not at Elkton at the time of the fire,
planned, counseled or encouraged the firing of the build-
ing, then the said Max Heller is guilty as an accessory
before the fact, as charged in the indictment, and liable
to the same punishment as is prescribed by law for the
principal actor."

It is contended, (a) that this instruction is without
evidence to support it; and (b) that there is nothing in
the evidence which tends to connect Max Heller with
the firing of the building.

[2] Our discussion of the evidence in connection with
the first assignment of error is a sufficient answer to
grounds (a) and (b) of this assignment; and there is no
merit in the further contention that the instruction is
erroneous because it did not tell the jury that Max Hel-
ler must know that the building was insured, and that
the planning and encouragement of the principal was
done with intent to injure the insurer. It was not nec-
essary that Max Heller should know that the building
was insured. The question of insurance on the build-
ing was immaterial since, if the defendants burned the
stock of goods, with intent to injure the insurer, they
were guilty whether the buildings were insured or not.
He knew that the goods were insured and if burned
would injure the insurer, and his only motive in encour-
aging, aiding and abetting Eli to burn them was to col-
lect the insurance and thereby injure the insurer.

[3] The third and last assignment of error is the action of the court in refusing to give instructions "B," "D" and "E," offered by the defendants.

The court did not err in refusing to give instruction "B." "Beyond a reasonable doubt" and "to a moral certainty" are synonymous terms, and either might be properly used alone in an instruction. But when both expressions are used in the same instruction, the jury, who are not expected to know the technical meaning of such phrases, would naturally believe that something more than proof beyond a reasonable doubt was necessary before they could convict. Besides, the court had already instructed the jury upon matters involved in this instruction when it gave instruction No. 3, in these words:

"The court instructs the jury that when a fire occurs the *prima facie* or first blush presumption is that it was caused by accident rather than by a criminal agency; and in order to the conviction of one accused of criminal guilt in causing the fire, the burden rests upon the Commonwealth to prove such guilt beyond a reasonable doubt."

This instruction tells the jury that the burden rests upon the Commonwealth to prove the defendant's guilt beyond a reasonable doubt, meaning thereby, necessarily, his guilt of every material charge contained in the indictment, and the jury is conclusively presumed to have so understood the instruction.

Instruction "D" undertakes to present the defendant's theory to the jury on a partial view of the evidence. The Commonwealth not only proved the defendants "had an opportunity to commit the crime and had an interest to burn the property destroyed," but other facts which tended to show that Eli Heller actually set fire to the building and that Max Heller pro-

cured, encouraged, aided and abetted him in the commission of the crime. Besides, on account of the phraseology of the latter half of the instruction, it is erroneous for the reasons given in discussing instruction "B" *supra*.

[4] Instruction "E" contains a correct statement of the law, and if no other instruction had been given upon the subject of reasonable doubt ought to have been granted. But, instructions 1, 2, 3 and 6, already given by the court, fully and sufficiently covered the principles of law laid down in instruction "E," and for that reason the court properly refused it.

A careful review of the record fails to disclose any error for which the judgment complained of should be reversed.

*Affirmed.*