# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

EARL DAVID INGE V.
COMMONWEALTH OF VIRGINIA.

October 8, 1976.

Record No. 760273.

Present, All the Justices.

*Richard M. Livingston; Rayner V. Snead, Jr.* (*Rhodes, Jennings & Livingston; Edmunds, Williams, Robertson, Sackett, Baldwin & Graves*, on brief), for plaintiff in error.

*Jim L. Chin, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

Cochran, J., delivered the opinion of the court.

Earl David Inge, defendant, was tried by a jury on an indictment charging him with the murder of Clifford Michael Smith. Inge was found guilty of murder of the first degree and by final judgment entered on the jury verdict was sentenced to life imprisonment in the State penitentiary. On appeal he has assigned numerous errors challenging the sufficiency of the evidence and certain rulings of the trial court.

The record shows that Smith, a student at Lynchburg Baptist College, resided with his wife and two infant sons in a ground floor apartment of the Greenwood Apartments, located on Sandusky Drive in the City of Lynchburg. Between 9:00 and 9:05 p.m. on April 26, 1975, as he sat on a sofa in his living room, Smith was struck in the chest and instantly killed by pellets from a shotgun shell fired through a glass windowpane and curtain at the rear of the apartment building.

The apartment complex in which Smith lived consisted of four buildings. Behind and below them was a wooded gulley through which flowed Black Water Creek, a stream 10 to 15 feet wide traversed by a water or sewer pipe 2 to 3 feet in diameter. Across the creek was a wooded slope at the top of which was the dead end of Fleetwood Drive, a street located in Campbell County just outside the Lynchburg corporate limits. From this dead end a dirt road extended into the woods, and footpaths led down to the creek. Smith's apartment was not more than a city block from the end of Fleetwood Drive. It was the Commonwealth's theory that Inge parked his camper at the end of Fleetwood Drive, proceeded on foot through the woods to Black Water Creek,

crossed the stream on the pipe, went up the embankment to Smith's apartment, shot Smith, retraced his steps, and fled in the camper.

The evidence against Inge was entirely circumstantial. Taken in the light most favorable to the Commonwealth, it showed, in summary, that on the morning of April 8, 1975, Smith had pursued Inge from the apartment complex, had him arrested, and accused him of breaking into and entering Smith's apartment a few minutes earlier; that Inge had threatened Smith; that some days later the occupant of another apartment in the complex observed Inge looking at the woods behind the apartments and peering into apartment windows; that several days before his death Smith testified against Inge at a preliminary hearing in the general district court on the statutory burglary charge, which was then certified to the grand jury; that on April 26, the date of the murder, the owner of a residence near the dead end of Fleetwood Drive saw a camper which resembled Inge's go down the street at 8:30 to 8:40 p.m.; that this vehicle did not return from the dead end before the witness left the area at approximately 9:00 p.m.; that immediately after the killing no one was seen coming from the rear to the front of the apartment complex; that another resident of Fleetwood Drive heard the noise and saw the lights of a vehicle going out of that street at high speed between 9:30 and 10:00 p.m.; and that Inge, when interrogated a few hours after the crime, admitting having fired a shotgun on April 26, at his parents' home, and having returned to Lynchburg that night by circuitous route that took him past the Greenwood Apartments after 9:30 p.m.

At the conclusion of the Commonwealth's evidence Inge's motion to strike the evidence was overruled. Inge, a convicted felon, then introduced evidence to establish an alibi. He testified in his own defense that on April 26, accompanied by his eight-year-old son, Stacey, he twice drove to his parents' home in Bedford County, shown to be about fifteen miles from Fleetwood Drive; that his parents were away from home at the time of his first visit; that during this visit he fired one shot from a shotgun of his father's at some blackbirds; that upon returning in the afternoon he left Stacey at the house and went fishing alone in two nearby streams until dark; that he arrived back at his parents' home at approximately 9:00 to 9:15 p.m., picked up his

son and drove to Lynchburg; that he went past the Greenwood Apartments after 9:30 p.m. on his way into Lynchburg, and saw a crowd in the street in front of the apartments; and that after stopping at a McDonald's Drive-In for refreshments he and Stacey arrived home between 10:00 and 10:30 p.m. His mother, father, and son corroborated portions of Inge's testimony.

Inge introduced employment records and other evidence to show that he was at work at the time the witness testified that he was examining the rear and interior of the Greenwood Apartments. He also relied upon the negative results of tests initiated by the police of tire tracks and of water and soil samples taken from Inge's socks and shoes, all of which failed to connect him with the area of the Greenwood Apartments.

█ Inge first contends that the trial court erred in permitting the Commonwealth's Attorney, in his opening statement, in his examination of Smith's widow, and in his cross-examination of the defendant, to reveal in excessive detail the circumstances under which Smith had accused Inge of statutory burglary. As an exception to the general rule of inadmissibility, evidence of other offenses is admissible to show prior relations between victim and accused, motive, intent, or knowledge. *Jordan* v. *Commonwealth*, 216 Va. 768, 770, 222 S.E.2d 573, 575-76 (1976); *Webb* v. *Commonwealth*, 154 Va. 866, 874, 152 S.E. 366, 368 (1930); *O'Boyle's Case*, 100 Va. 785, 792, 40 S.E. 121, 123 (1901).

Inge concedes that it would have been proper to establish that he had been charged with the earlier offense, that Smith had testified against him in the preliminary hearing, that the charge had been certified to the grand jury, and that it was anticipated that Smith would testify against him before the grand jury and in any other proceedings. This skeletal outline, however, would have omitted important details, such as Smith's pursuit and identification of Inge as the man who had broken into his apartment, and Inge's threat to Smith. The details of the burglary tended to show not only motive on the part of Inge to silence his accuser but also familiarity with the area and with the interior of the Smith apartment. Therefore, since the evidence was relevant, unlike that proscribed in *Boggs* v. *Commonwealth*, 199 Va. 478, 100 S.E.2d 766 (1957), on which the defendant relies, the trial court did not err in admitting it.

█ Inge next argues that the trial court improperly admitted into evidence two black-and-white photographs taken of the

victim's body before it was removed from the sofa on which he was sitting at the time of his death. In objecting to the introduction of these photographs as irrelevant and inflammatory, defense counsel offered to stipulate that Smith was killed by a criminal agency. The photographs showed the pattern and location of the pellets as they struck the victim, and the force of the shotgun blast. The admissibility of the photographs was within the sound discretion of the trial court. *Evans* v. *Commonwealth*, 215 Va. 609, 614, 212 S.E.2d 268, 272 (1975); *Brown* v. *Commonwealth*, 212 Va. 515, 519, 184 S.E.2d 786, 789 (1971); *Timmons* v. *Commonwealth*, 204 Va. 205, 213-14, 129 S.E.2d 697, 703 (1963). We find no abuse of discretion.

Inge also maintains that the trial court erred in refusing to instruct the jury to disregard the testimony of Commonwealth witness Robert G. Hooper, an Appalachian Power Company employee. Hooper testified that about 11:00 a.m. on a day in early April, 1975, he was driving his truck up the driveway of the Greenwood Apartments to the back of the complex when he saw a barefooted man in pajamas who was chasing another man, and "[w]hen they got to the gulley the man in front kept on and the man in the blue pajamas, he stopped."

When defense counsel undertook on cross-examination to show that the gulley referred to by the witness was not the one in which Black Water Creek flowed, the witness had difficulty in relating his testimony to the aerial photographs of the area around the apartment complex. Nevertheless, Hooper testified that the gulley was deep, "fairly wide, and contained either a water line or a sewer pipe" which crossed "a little branch." He had previously known Inge but, although the two men ran within 40 to 45 feet of him, he did not recognize the defendant.

The trial court did not err in permitting the jury to consider Hooper's testimony. It was for the jury to determine the credibility of the witness and the weight to be accorded his testimony. The jury reasonably could have inferred from Hooper's testimony that Smith pursued Inge from the apartment into the gulley where the pipe crossed Black Water Creek, and that Inge was familiar with the gulley, the pipe, and the area behind the Greenwood Apartments. *See Durham* v. *Commonwealth*, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973).

Moreover, this testimony tended to corroborate the testimony of Smith's widow.

■ The next assignment of error relates to the identification testimony of Gilbert R. Baldock, the resident of Fleetwood Drive who observed the camper proceed towards the dead end of that street on the evening of the killing. On April 28, police officers took Baldock to the parking lot of Simplimatic Engineering Company, where Inge was employed, to look at Inge's camper. Officers were taking pictures of the vehicle as Baldock approached, and he was asked if this was the truck he had seen on the night of the crime. There was no other vehicle of similar design nearby. Baldock was permitted to testify that the vehicle appeared to be the same truck, although he could make no positive identification without having the serial number to verify.

Analogizing the identification of the Inge truck on the parking lot to a one-on-one confrontation between a witness and a suspect, Inge contends that the identification evidence was unduly suggestive and tainted and should have been excluded. His reliance on *Allen* v. *Commonwealth,* 211 Va. 805, 180 S.E.2d 513 (1971), is misplaced. There, we pointed out that the witnesses who identified the defendant's car admitted that their identification was based upon their observation of blue paint on the bumper and the damaged fender of a car shown to them by the police on the day after the crime. Although we held this identification evidence insufficient to sustain a conviction under the "hit and run" statute, no question was raised as to the admissibility of the evidence. Indeed, Inge concedes that he can offer no direct authority to support his argument that Baldock's identification of the camper violated Inge's constitutional rights.

To determine whether identification of a suspect in a pre-indictment lineup conducted without counsel present violates due process we consider the "totality of the circumstances." *Zeigler* v. *Commonwealth,* 212 Va. 632, 638, 186 S.E.2d 38, 43 (1972). But we decline to hold that a lineup is required for the identification of an inanimate object possessed by a suspect. We believe that the one-on-one identification of Inge's vehicle presents questions as to the credibility of the witness and the weight of his testimony rather than an admissibility question of constitutional dimension. We hold,

therefore, that the trial court did not err in admitting the testimony of Baldock into evidence.

Inge has assigned error to the ruling of the trial court in restricting the testimony of a defense witness, Clark Inge, defendant's brother. This witness testified that some time after Smith's murder he and Stacey Inge drove near the scene of the crime and observed other campers similar to that of the defendant. One appeared to be identical to defendant's and he said to Stacey, "That looks like David's truck." The court, over defendant's objection, ruled out this statement. We find no error in this action of the trial court. The self-serving declaration of the witness made out of court was hearsay evidence inadmissible to corroborate his testimony in court. *Jessie's Case*, 112 Va. 887, 890, 71 S.E. 612, 613 (1911).

The principal assignments of error challenge the sufficiency of the evidence. Inge waived his motion to strike the Commonwealth's evidence at the conclusion of that evidence by adducing evidence in his own behalf, and the sufficiency of the evidence, therefore, is to be determined from the entire record. *Tolley* v. *Commonwealth*, 216 Va. 341, 347, 218 S.E.2d 550, 554 (1975).

The applicable principles of law are well settled. When the evidence is wholly circumstantial, as here, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. Nevertheless, it is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts. The burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime. *Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969).

There was evidence that Inge broke into and entered Smith's apartment on April 8, that Smith chased Inge to Black Water Creek, and that Smith identified Inge as the burglar. Inge testified that he was not the burglar and that he ran only to assist Smith in pursuit of the real culprit. Smith's widow, however, testified that when Inge gave a similar explanation to

the arresting officers, Smith insisted that Inge was "the guy in my apartment," and that Inge said to Smith, "Don't get me in trouble." The jury could have construed this statement of Inge's as a threat and could have inferred that, as a convicted felon, Inge was especially motivated to prevent Smith from testifying against him in further proceedings after the preliminary hearing.

Baldock, who had been engaged in automobile sales for thirteen years, testified that his residence was the last one on the right before a motorist reaches the dead end of Fleetwood Drive; that he was mowing grass in his front yard when the camper, which he described as an F-100 Ford, standard half-ton pickup truck, light green in color, with a long wheel base, a camper shell on it, and "wood or simulated wood vinyl on the side," passed him at 8:30 to 8:40 p.m. on the 26th, going towards the dead end; that he could not identify the driver, who appeared to be the only occupant; that the camper had not returned when he left home at approximately 9:00 p.m.; and that he subsequently viewed the Inge vehicle and found that it resembled in every respect the one which he had seen on Fleetwood Drive.

Willie Anderson Reynolds, another resident of Fleetwood Drive, testified that at 9:30 to 10:00 p.m. on the 26th he heard the noise and saw the lights of a vehicle coming from the dead end past his house "running faster than any other vehicle ever goes up through there . . . ."

The jury could have inferred from the testimony of Baldock and Reynolds that Inge drove his camper down Fleetwood Drive and parked it at or near the dead end shortly after 8:30 p.m. and that he left at a high rate of speed at or about 9:30 p.m.

Patricia Bailey, a neighbor, testified that she was in her apartment after dark on the 26th when she heard the discharge of a firearm, and that she went to her open window and heard someone running in the woods behind the apartments.

Delores Mabry, who lived in the building next to that of the Smiths, returned with her husband from shopping about 9:00 p.m. She was standing outside in front of her apartment when she heard what she thought was a gunshot. Remaining outside until her brother, who had come to visit them, had gotten out of his car, she did not see anyone come from the rear to the front of any of the apartment buildings.

Patricia Brown testified that at approximately 9:00 a.m. on April 14, she saw a man whom she believed to be Inge standing outside the wall behind the apartments and looking at the woods; that he suddenly jumped over the wall and peered into the windows of her apartment; and that he then jumped back over the wall and proceeded toward the next building in which Smith lived. The witness had originally believed that the date of this incident was April 13, a Sunday, but concluded that it was Monday, April 14, because she had just returned from taking her child to school. Although Inge adduced evidence to show that the 14th was his first day at work at Simplimatic Engineering Company, the trial judge correctly ruled that this conflict in the evidence created a jury issue. The jury could have believed that Mrs. Brown was mistaken as to the date. The jury also could have inferred from this testimony that Inge returned to "case" the apartments, *i.e.*, to study the terrain and the interior arrangement of the apartments with a view to committing a crime.

The lengthy interrogation of Inge revealed that he had been at his parents' home in Bedford County on April 26. Police officers thereupon visited this home in the early morning hours of the 27th. They examined two shotguns, one of which was clean and the other filled with sand or mud around the breech. One of the officers stated that he subsequently told Inge, as the interrogation continued, that his father would give Inge "hell" because of the condition of the dirty gun. When the officers seized the guns after Inge's arrest on the 28th, they observed that the dirty firearm had been cleaned. Inge admitted that on the 27th he had returned to his parents' home and cleaned the gun. The jury could have inferred, however, that Inge did this to prevent the police from taking sand or mud from the breech to compare with soil samples taken near the scene of the crime.

There was evidence that when first questioned Inge's mother was unable to estimate with any certainty the time when Inge left with Stacey on the 26th. At trial her testimony, as well as that of Inge's father and son, fixed the time of departure at approximately 9:00 p.m., as one specified television program ended and another commenced. The investigating officers testified that the witnesses never mentioned the television programs when they were first questioned concerning their activities on the evening of the 26th.

Inge testified that it was his intention, upon leaving his parents' home, to take his son to a certain Tastee Freeze located near Lynchburg College in Lynchburg. The evidence showed, however, that instead of taking the most direct route he took a circuitous route, passed several drive-in eating establishments, proceeded along Sandusky Street past the Greenwood Apartments, changed his route, and went to a McDonald's Drive-In. Inge testified that, after stopping for food at the drive-in, he and his son arrived home at 10:00 or 10:30 p.m. He admitted passing the Greenwood Apartments after 9:30 p.m.

A defense witness, former State Trooper Luther Walden, testified that, driving for the most part 5 to 10 miles per hour under the legal speed limit, he drove his car from the end of Fleetwood Drive to Inge's parents' home, 15 miles away, in 24 minutes. Obviously, as the jury could have inferred, one proceeding at a higher rate of speed could cover the distance in shorter time.

We hold that the evidence is sufficient to support the conviction. The jury reasonably could have inferred, from the unbroken chain of necessary circumstances, established to its satisfaction, that Inge had a motive to kill Smith; that he was placed within several hundred yards of the victim shortly before and shortly after the time of the crime; that he had the means to commit the crime, in that he owned a camper and had access to a shotgun; that his conduct before and after the crime was consistent with guilt and inconsistent with innocence; and that all of these factors concur in pointing him out as the perpetrator of the crime.

The jury, which observed the demeanor of the witnesses, was free to disbelieve the alibi testimony of Inge and his relatives. The jury reasonably could have been convinced beyond a reasonable doubt that Inge committed the crime, sped in his camper to his parents' home, and departed with his son shortly after 9:30 p.m. Accordingly, the judgment of the trial court will be affirmed.

*Affirmed.*