COURT OF APPEALS OF VIRGINIA

Present:   Judges Fulton, Ortiz and Senior Judge Petty
Argued at Lexington, Virginia


LADARIUS TOMAS JEFFRIES, S/K/A
 LADARIUS THOMAS JEFFRIES
                                                    MEMORANDUM OPINION* BY
v.       Record No. 0679-21-3                       JUDGE WILLIAM G. PETTY
                                                    NOVEMBER 9, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Paul C. Galanides for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Danville convicted appellant, Ladarius

Thomas Jeffries, of first-degree murder, felony use of a firearm, and discharge of a firearm from a

motor vehicle.  The trial court sentenced Jeffries to a total of thirty-three years' incarceration.  On

appeal, Jeffries contends that the circumstantial evidence introduced at trial was insufficient to

exclude the reasonable hypothesis that he was not the murderer.  We disagree and affirm the trial

court's judgment.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(2016)). In doing so, we discard any of Jeffries' conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

On March 4, 2020, at 6:44 a.m., Danville City Police discovered Melvin Smith dead in his front yard, having been shot at least seven times. A video recorded by Smith's next-door neighbor's surveillance camera shows that a man wearing a gray hoodie exited a vehicle outside of Smith's home at 6:38 a.m., ran toward Smith's property, and discharged a firearm before running off screen. The video further shows that the man returned to the vehicle and drove past Smith's property. According to an eyewitness, the man fired his firearm "some more" as he drove past Smith's home.[1] No eyewitness saw any other person with the shooter. Police collected six "RMP .45 auto shell casings" and multiple glass fragments from the yard.

Police discovered during their investigation that Ariel Hicks rented a Hyundai Elantra matching the description of the suspect vehicle and that it was equipped with GPS tracking. By using the GPS tracking, police found the Elantra at a repair shop in Greensboro, North Carolina. Police observed that the Elantra's passenger side window was broken and collected glass from the passenger side door. Police also recovered Jeffries' palm prints from the exterior of the Elantra's trunk and passenger side door, as well as gunshot residue from the interior door panel.

Police found and spoke to Hicks at the repair shop. Hicks testified that she rented the Elantra and gave it to Jeffries on March 3, 2020. According to Hicks, Jeffries informed her by phone that the Elantra's window "was broken out" and needed to be fixed. Hicks testified that Jeffries then picked her up at her residence in a truck at "like six o'clock" in the morning of

---

[1] Smith's next-door neighbor testified that she awoke after hearing "several" gunshots and that the suspect fired "some more" as he drove away. Another neighbor testified that she heard six gunshots, followed by a "significant pause," and then four more.

March 4, 2020, and drove her to the residence of Leslie Johnson.[2]  Hicks explained she and Jeffries went inside Johnson's home, that Jeffries was the only man at the residence, and that he gave her the keys to the Elantra, which was located behind the home.  Hicks then drove the Elantra to Greensboro to get its passenger window fixed.

Later that day, police found Jeffries inside a bedroom at Johnson's home and arrested him.  Police searched the bedroom and found a gray hoodie, Jeffries' identification, and a large sum of money wrapped in a rubber band.  Upon searching the rest of Johnson's home, police recovered a red iPhone, twelve "unfired Hornaday .45 auto rounds" within a Kickback Jacks takeout bag, and glass fragments from inside of a vacuum cleaner.

Police extracted information from the red iPhone, which was tied to a phone number ending in 5595.  Upon reviewing the extraction, police discovered one of the three Apple IDs associated with the red iPhone used the term "ljefferies" while another used the term "Boog," which was known to law enforcement as Jeffries' alias.  Police further discovered that a text message was sent from the red iPhone to Hicks during the afternoon of March 3, 2020, asking her to pick up food from Kickback Jacks.  At 11:46 p.m. that same day, Hicks sent a text message to the red iPhone requesting a "pic," and received a photograph of Jeffries in response. Upon further review, police discovered that the red iPhone had connected to "Hairston-WiFi" approximately five hours before the shooting.  Police searched the home of Toniqua Hairston, Jeffries' relative, where they found two "spent" .45 ammunition casings on the back deck of the residence.

The information extracted from the red iPhone also revealed that a message was sent from the phone to Kunta Daniels four minutes before the shooting stating, "Showtime!!"  Three hours later, another text message was sent from the red iPhone to Daniels providing the address

---

[2] Hicks also testified that she "got up" around "five or six" in the morning.

of Johnson's home. Within a minute after the red iPhone's message was sent, a person matching Daniels' description was observed exiting Daniels' apartment and departing in Daniels' Lexus sedan.[3]

Jeffries was charged with first-degree murder, felony use of a firearm, and discharge of a firearm from a motor vehicle. At the jury trial, the Commonwealth introduced testimony from several law enforcement officers, Smith's neighbors, and Hicks, along with the evidence collected by police during their investigation. The Commonwealth also introduced evidence that Jeffries provided his probation officer with the red iPhone's phone number as his personal cell phone number when he was released from jail on July 19, 2019. In addition, the Commonwealth introduced expert testimony showing that the glass fragments collected by police "were all consistent in all the physical properties and the refractive index." The Commonwealth's expert testimony further showed that the discharged ammunition casings recovered by police were fired from the same firearm and that cellular records and GPS data showed that the red iPhone and the Elantra traveled together until after the shooting. At the close of the Commonwealth's evidence, Jeffries moved to strike, which the trial court denied.

During Jeffries' case-in-chief, Rashia Jones, with whom Jeffries had a child, testified that she acquired the red iPhone number while Jeffries was in jail in 2019. Jones further testified that Jeffries had been at her house around three or four in the morning of the shooting and that she saw him leave her house in a truck at 6:30 a.m. Jones admitted that she purchased bullets at Jeffries' request the day before the shooting and that she did not know where the red iPhone was on the day of the shooting.

---

[3] Law enforcement had previously installed surveillance cameras at Daniels' residence as a part of an ongoing criminal investigation.

At the close of all the evidence, Jeffries renewed his motion to strike on the basis that the circumstantial evidence presented at trial failed to establish that he was the shooter. The trial court denied the motion, and the jury subsequently convicted Jeffries of all charges. The trial court sentenced Jeffries to a total of thirty-three years' incarceration, and this appeal followed.

ANALYSIS

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*)). "The sufficiency 'inquiry does not distinguish between direct and circumstantial evidence, as the fact finder . . . is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Breeden v. Commonwealth*, 43 Va. App. 169, 177 (2004) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (*en banc*) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). "However, the Commonwealth is 'not required to exclude every possibility' of the defendant's innocence but, rather, 'only . . . hypotheses of innocence that flow from the evidence.'" *Rams*, 70 Va. App. at 28 (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "The reasonableness of 'an alternate hypothesis of innocence' is itself a question of fact, and thus, the fact finder's

- 5 -

determination regarding reasonableness 'is binding on appeal unless plainly wrong.'" *Id.* at 28 (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010)). "By finding the defendant guilty, therefore, the [fact finder] 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). Finally, because Jeffries introduced evidence in his own behalf, he has waived his motion to strike at the conclusion of the Commonwealth's case, and we will determine the sufficiency of the evidence from the entire record. *Inge v. Commonwealth*, 217 Va. 360, 366 (1976).

Jeffries argues that the circumstantial evidence introduced at trial was insufficient to exclude the reasonable hypothesis that he was not the murderer and advances three theories in support thereof.[4] Jeffries first contends that the Commonwealth failed to exclude the hypothesis that another shooter was involved in the murder. Although Jeffries concedes that the eyewitnesses "only saw one person," he points out that only six ammunition casings were found at the crime scene, Smith was shot seven times, and some neighbors heard more than seven gunshots. Based on this evidence, Jeffries argues that "another person or persons could have been present or involved in the shooting." Neither Jeffries nor the record explain how a finding that at least seven bullets were fired would establish that another shooter was involved in the murder. Rather, the eyewitnesses testified that they did not see any other person with the murderer. Accordingly, the Commonwealth was not required to exclude the possibility that there was more than one shooter. *See Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) ("The Commonwealth need exclude only reasonable hypotheses of innocence that 'flow from the

---

[4] Jeffries also argues that the evidence failed to show that he had intended to rob Smith and his lack of motive is "inconsistent with the remainder of the evidence in this case." Motive, however, "is not an essential element of murder." *Tibbs v. Commonwealth*, 31 Va. App. 687, 704 (2000).

evidence itself, and not from the imagination' of the defendant." (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017))).

For his second theory of innocence, Jeffries argues that the evidence implicated Daniels as the murderer. In support of this argument, Jeffries points out that Daniels appeared "to be communicating with whomever is using the red iPhone and in the Hyundai at the time of the murder."[5] Jeffries further claims that "[n]othing in the evidence precludes the possibility that Daniels used the cell phone and Hyundai when he committed the murder." To the contrary, the Commonwealth's expert testimony showed that the red iPhone and Elantra were in the same place at the time of the murder. Under Jeffries' theory of innocence, Daniels would have had two phones, the red iPhone and his personal cell phone, and texted himself just minutes before the murder. Moreover, the record reflects that the red iPhone was connected to Apple IDs associated with Jeffries, Jeffries provided his probation officer with the red iPhone's phone number, and Jeffries sent Hicks a photograph of himself from the red iPhone just six hours before the murder. Given these facts and other evidence in the record implicating Jeffries, the jury was not plainly wrong in rejecting the theory that Daniels was the murderer. "[T]he factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Moseley*, 293 Va. at 464.

In his final argument, Jeffries contends that the evidence established an alibi in favor of his innocence, namely that he was with Hicks at the time of the murder. Jeffries relies on Hicks' testimony that Jeffries picked her up in a truck at "like six o'clock" on the morning of the murder and drove her to Johnson's home. Hicks also testified, however, that she "got up" around "five

---

[5] Jeffries also claims that "Daniels knew Smith was dead even before police had had a chance to inform his widow." Smith's widow, however, testified that Daniels contacted her after the police notified her of her husband's death.

or six" in the morning and that Jeffries picked her up after he informed her that the Elantra's window "was broken out." In light of the evidence tying the Elantra to the murder and Hicks' approximations of time, the jury was not plainly wrong in concluding that Jeffries picked up Hicks after the murder. *See Kelley*, 69 Va. App. at 626 ("'The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility' as well as 'the weight to be given their testimony.'" (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010))).

"By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017)). "The rejection of a hypothesis of innocence 'is binding on appeal unless plainly wrong . . . .'" *Ervin*, 57 Va. App. at 519 (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 13 (1997)). The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Jeffries was guilty of first-degree murder, felony use of a firearm, and discharge of a firearm from a motor vehicle.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed*.